UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RADHA BHATIA, individually and as
Trustee of the Value Life Psychological
Services, LLC, Defined Benefit Pension
Plan, MOTILAL BHATIA, and VALUE
LIFE PSYCHOLOGICAL SERVICES, LLC,

                Plaintiffs,

       - against -

HAROLD DISCHINO, DISCHINO AND
ASSOCIATES, PC, ROBERT LANG,
MATTHEW LANG, LORAC FINANCIAL
SERVICES, INC., KENNETH
HARTSTEIN, ECONOMIC CONCEPTS,
INC., PENSION STRATEGIES, LLC,

             Defendants.

Index No.: ___08-5609 (KSH)___

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiffs Radha Bhatia, Motilal Bhatia and Value Life Psychological Services,

LLC, by and through their attorneys, Balestriere Lanza PLLC, respectfully allege the

following, upon information and belief:

## PRELIMINARY STATEMENT

      1.     Plaintiffs Radha Bhatia ("Radha"), individually and as Trustee of the

Value Life Psychological Services, LLC, Defined Benefit Pension Plan, Motilal Bhatia

("Moti") (collectively, "Bhatias") and Radha's psychology practice, Value Life

Psychological Services, LLC ("Value Life Practice") (collectively, "Plaintiffs"), are forced

to sue because their trusted professional tax and financial advisors deceived them into

purchasing what turned out to be an abusive tax shelter, costing Plaintiffs over one million dollars.

2.      In late 2004, after discussing their personal finances with their accountant—Ron Markovich ("Markovich") of the Dischino and Associates, PC accounting firm ("Dischino Firm")—the Bhatias asked if they should be doing anything else to plan and save for retirement.  Markovich suggested establishing a 412(i) plan, a type of retirement plan funded exclusively by life insurance or annuity contracts.  But because Markovich personally had no experience with 412(i) plans, he referred them to Harold Dischino ("Dischino"), the principal of the Dischino Firm.

3.      Dischino met with the Bhatias in 2004 and proposed that they establish a 412(i) plan (the "Value Life Plan") through Radha's Value Life Practice.  Joined by insurance agents Bob and Matt Lang (collectively, the "Langs") of Lorac Financial Services, Inc. ("Lorac"), Dischino convinced the Bhatias that establishing the Value Life Plan was a legitimate and effect way to save for retirement.

4.      Having convinced the Bhatias to go through with this strategy, the Langs contacted Economic Concepts, Inc. ("ECI"), the company that designs and distributes an abusive tax shelter known as the Pendulum Plan.  The Langs also contacted Pension Strategies LLC ("Pension Strategies") (all defendants collectively, "Defendants"), another company that helps establish, administer, and maintain such plans. Throughout the entire process, the Langs remained heavily involved.

5.      Indianapolis Life Insurance Company ("Indy Life") was the company selling the actual insurance policy (the "Policy") that would fund Radha's Value Life

2

Plan. Indy Life is not a party to this Complaint because it previously settled all possible claims involving the Bhatias. No agreement exists between Plaintiffs and Defendants.

6.       Defendants told the Bhatias that the IRS specifically approved of these types of retirement plans, but this was a lie. Indeed, long before Defendants seduced the Bhatias with empty promises, the IRS warned that 412(i) plans were extremely suspicious investment vehicles, subject to the "listed transaction" reporting requirements of the Internal Revenue Code.

7.       Shortly after the Bhatias established the Value Life Plan and purchased insurance in accordance with Defendants' recommendations, the Bhatias received notice that, contrary to Defendants' previous assertions, the Value Life Plan was an illegal tax shelter and that the IRS was going to audit Plaintiffs. As a result of the audit, which started in 2006, the IRS fined the Bhatias many thousands of dollars.

8.       Moreover, because Defendants failed to file the required Form 8886 disclosing that the Plaintiffs were engaged in a listed transaction, the IRS fined the Bhatias an additional $900,000.

9.       Defendants were well aware of the IRS's position but could not resist the temptation of making a quick buck at the Bhatias' expense. As a result, the Bhatias have suffered severe hardship through the punishments of the IRS, money lost to the Value Life Plan and to Indy Life, and related fees paid to lawyers and other advisors.

10.      After repeated, unsuccessful attempts to recover their lost funds from Defendants, Plaintiffs now must sue Defendants to force them to make some amends to Plaintiffs from Defendants' conspiracy to defraud.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1367 because Plaintiffs assert claims under the Employee Retirement Income Security Act, 29 U.S.C. § 18 ("ERISA").

12.     This Court has personal jurisdiction over all parties to this suit. This Court has jurisdiction over the Bhatias because they are citizens of the State of New Jersey.

13.     This Court has personal jurisdiction over Value Life Psychological Services, LLC because it has its principal place of business in the State of New Jersey.

14.     This Court has personal jurisdiction over Defendants Harold Dischino and the Langs because they are citizens of the State of New Jersey.

15.     This Court has personal jurisdiction over Defendants, the Dischino Firm and Lorac because they have their principal places of business in the State of New Jersey and seek the legal benefits and protections afforded by the State of New Jersey.

16.     This Court has personal jurisdiction over Defendant ECI because it does significant business in the State of New Jersey and seeks the legal benefits and protections afforded by the State of New Jersey.

## PARTIES

17.     Plaintiff Radha Bhatia is a psychologist who resides in Kinnelon, New Jersey.

18.     Plaintiff Motilal Bhatia is married to Radha Bhatia, lives with her in Kinnelon, New Jersey, and files a joint income tax return.

4

19.     Plaintiff Value Life Psychological Services, LLC is Radha's private psychology practice, located in Cedar Grove, New Jersey.

20.     Harold Dischino is a Certified Professional Accountant and the principal of Dischino and Associates, PC, which does business in Fairfield, New Jersey.

21.     Dischino and Associates, PC, is a private company which has its principal place of business in Fairfield, New Jersey.

22.     Matthew Lang is a financial advisor who sells life insurance and is a principal of Lorac Financial Services.

23.     Robert Lang is a financial advisor who sells life insurance and is also a principal of Lorac Financial Services.

24.     Lorac Financial Services, Inc. is a financial advisory company which has its principal place of business in Summit, New Jersey.

25.     Economic Concepts, Inc. is an executive benefit planning company which has its principal place of business in Scottsdale, Arizona, which specializes in retirement plan creations and administration.

26.     Kenneth Hartstein ("Hartstein") is the chief executive officer of ECI and is experienced in financial planning and pension plan consulting.

27.     Pension Strategies, LLC, is a company that helps in the administration and management of retirement plans.  It is incorporated in Arizona and has its principal place of business in Phoenix, Arizona.

## STATEMENT OF FACTS

### Markovich Steers Bhatias to Dischino

28.     Radha established Value Life Practice in August 2001 and is the sole employee.  Radha owns 99% of the Value Life Practice, and her minor daughter owns the remaining 1% stake.

29.     In October 2004, the Bhatias met with their then accountant, Ron Markovich of the Dischino Firm, to discuss their family finances. At the meeting, Moti asked Markovich if there was anything more the Bhatias should be doing with their finances.

30.     Markovich suggested that the Bhatias consider establishing a type of retirement plan known as a 412(i) plan, explaining that it was an excellent way for the Bhatias to significantly reduce their tax liability.

31.     Because Markovich was not personally familiar with 412(i) plans, Markovich referred the Bhatias to his boss, Harold Dischino, the principal of the Dischino Firm.

### Background of 412(i) Plans

32.     A 412(i) plan is a type of retirement plan frequently established by small professional services companies that offers tax benefits for money flowing both into and out of the plan.  412(i) plans are "defined benefit plans," which provide for a set, or "defined," level of benefits once an individual reaches retirement.  Unlike many other types of retirement plans, which may hold stocks, bonds, or other securities, 412(i) plans are comprised exclusively of annuities or life insurance contracts.

33.     An employer's contributions to a 412(i) plan are tax deductible up to a certain amount each year.  Because the IRS levies taxes on any excess contributions to the plan, employers attempt to stay below this limit.

34.     In addition to the deductions that can be taken on money going *into* a 412(i) plan, there are also potential benefits relating to money comings *out of* the plan.

35.     Generally speaking, assets taken out of a plan during a beneficiary's lifetime are taxable as ordinary income, and assets taken out after death are included in the decedent beneficiary's taxable estate.

36.     By purchasing a life insurance policy *inside* of the plan and then transferring the policy out of the plan—either to the plan beneficiary or an insurance trust—it is possible to reduce the overall amount of money in the retirement plan, thereby reducing long-term tax liabilities.  Additionally, an insurance policy owner may borrow money, tax-free, from the policy itself.

37.     Unfortunately, many 412(i) plans were established and maintained as abusive and illegal tax shelters rather than acceptable tax havens.  Accordingly, the IRS has taken a strong position against abusive 412(i) plans by issuing rulings and notices about them as far back as 1989 and, more notably, as recent as 2005.

38.     One abusive scheme involves what is called a "springing cash value" insurance policy.  All insurance policies have a "cash surrender value," the amount that a policy owner would receive back from the insurance company upon canceling the policy before the death benefit is paid out.  This value generally approximates the aggregate of premiums paid into the policy, less some minor charges.  With springing

7

cash value policies, the cash surrender value is extremely small in relation to the total premiums paid—"artificially depressed"—for a certain period of time, after which the cash surrender value "springs" back up to normal levels.

39.    Under this scheme, the 412(i) plan pays the insurance premiums.  After what is generally the fifth year, the 412(i) plan *participant* purchases the policy from the *plan* at the artificially depressed cash surrender value.  The short-term implication is that the participant can own a policy but avoid paying five years' worth of costly premiums.   The long-term implication is that, from the plan's perspective, this transaction converts the sum of all premiums paid into the much smaller cash surrender value, thereby reducing the amount of money that ultimately needs to be withdrawn from the plan and, consequently, the long-term tax implications of withdrawing this money.  After the policy is purchased out of the plan, its cash surrender value springs back up, giving the policy owner an instrument representing a large sum of cash that can be redeemed or borrowed from at any time.

40.    Because the IRS has pegged such a scheme as abusive and illegitimate, it has taken steps to eradicate this and other types of 412(i)-related misconduct.   On February 13, 2004, the IRS issued Revenue Rulings 2004-20 and 2004-21  as well as a set of proposed regulations[1] (collectively, the "Revenue Rulings") to address the abuses in the marketplace.

---

[1] These regulations ultimately went into effect on August 29, 2005, but the February 13, 2004, notice had put the entire industry, including all Defendants, on notice that the IRS took a firm position against the establishment and maintenance of abusive tax schemes.

41.     In addition to outlining the excise tax that would be levied on excess contributions to a 412(i) plan, the IRS also made clear that any individual purchasing a life insurance policy out of the 412(i) plan would have to pay fair market value for the policy, *not* the artificially depressed value that people had been told they could pay.

42.     Aside from the IRS's various substantive pronouncements, that IRS also stated that any person or entity—such as Radha's Value Life Practice—that attempts to take a tax deduction for any contribution to a 412(i) plan must file a Form 8886, a form indicating that the filer is engaged in a "listed transaction," or one that the IRS has designated as suspicious and closely related to tax violations.

### Deceiving the Bhatias into the 412(i) Plan

43.     In October and November 2004, months after the IRS issued the Revenue Rulings and the proposed regulations, Dischino met with the Bhatias multiple times to talk them into establishing the Value Life Plan through Radha's Value Life Practice.

44.     In contrast to individual retirement accounts, employer-sponsored retirement plans such as 401k, 412(i), and pension plans must be established through the entity that employs prospective plan participants.

45.     Dischino repeatedly extolled the virtues of the plan as a source for tax free loans from the insurance policy as well as providing tax deductible contributions. He even reassured the Bhatias by claiming to have a 412(i) plan of his own.

46.     During these meetings, Dischino repeatedly assured the Bhatias that the IRS approved of the type of plan in which they would enroll, both in form and in practice.

47.     Still, by early December 2004 Dischino convinced the Bhatias that establishing a 412(i) plan would aid in saving for their retirement. Dischino told them to meet with a financial planner, Bob Lang, from Lorac Financial Services. The Bhatias discussed the specifics of the potential Plan with both of the Langs.  Over the following weeks, Bob Lang and Dischino explained to the Bhatias precisely how the Plan would work and continued to urge the Bhatias to go along with setting up the Value Life Plan.

48.     The Langs also repeatedly extolled the virtues of the plan as a source for tax free loans from the insurance policy as well as providing fully tax deductible contributions.

49.     Unknown to the Bhatias, the Langs and Dischino had financial incentives to sell the Bhatias on this Plan. Both of them received commissions, directly or indirectly, from Indy Life on each policy sold.

### ECI and Indy Life Come into the Picture

50.     Radha had established Value Life Practice several years prior, but the actual form of Value Life Plan developed in December 2004.  The Bhatias registered Value Life Practice as a vehicle for the Value Life Plan by December 24, 2004, in order to establish the Value Life Plan before the end of the year for tax purposes. During this time, ECI and Pension Strategies came into the picture and worked with the Langs to establish the Value Life Plan as quickly as possible.

51.     On December 29, Lang proposed a model under which the Bhatias would make minimum contributions of $360,107 per year.  According to the Langs, this was

the smallest possible yearly contribution if the Bhatias were to derive any benefit from establishing the Plan.

52.     The Langs worked with ECI because both the Langs and ECI worked with Indy Life, from whom they received commissions for successfully recruiting clients.

53.     During this period, while Matt Lang was the primary contact for the Bhatias at Lorac, Bob Lang handled all difficult questions posed by the Bhatias. Consequently, the Bhatias spoke repeatedly with Bob Lang and, over time, came to trust both the Langs as well as Dischino.

54.     At no point did the Langs or Dischino *ever* mention the possibility that the IRS might declare Radha's use of the 412(i) to be abusive or, more, that the IRS had *already* declared the plan effectively illegal for retirement purposes. Nor did they *ever* hint that the deductions were or could be deemed invalid.

55.     Furthermore, neither the Langs nor Dischino *ever* mentioned that the Bhatias would have to file a Listed Transactions Filing (IRS Form 8886). Defendants' decision not to file this would later haunt the Bhatias in fines of hundreds of thousands of dollars and untold headaches.

56.     Listed Transactions are transactions classified by the IRS as suspicious in some way or another and potentially indicative of an abusive tax shelter. Because they are considered suspicious, the IRS requires that all who engage in Listed Transactions file a special disclosure form, Form 8886, denoting this business. Of course, informing the Bhatias that this form needed to be filed would very likely have tipped them off to the potential abuse about to be perpetrated against them.

57.     In fact, had any Defendant mentioned the requirement to file Form 8886 and the reason the filing was required, the Bhatias would *not* have invested in the plan and would have saved themselves over a million dollars.

58.     When the Bhatias said that the $360,107 annual contributions were too much for their budget, the Langs—desperate to close the deal— conspired with ECI and Pension Strategies to modify their assumption and doctored the plan, lowering the annual contribution to $248,212.

59.     On March 30, 2005, the Bhatias formally established their Value Life Plan.

### The Bhatias Seek Confirmation of the Value Life Plan's Acceptability

60.     Matt Lang explained that, after creating the Value Life Plan, ECI would submit papers to the IRS asking for a favorable determination letter regarding the legitimacy Value Life Plan.  Lang Assured the Bhatias that after a number of months the IRS would issue a determination very similar to the sample he had shown them.

61.     The Bhatias requested confirmation from the IRS that their plan fell within its guidelines for a 412(i). The Bhatias received a positive reply on October 25, 2005, in which the IRS said that it had made a "favorable determination."   The Bhatias continued in their belief that Dischino, Lang, and ECI had been upfront and honest with them.

62.     One thing that Defendants did not disclose to the Bhatias, however, is the fact that favorable determination letters are based on a very small amount of information.  Indeed, the IRS made its determination based upon the overall structure of the Value Life Plan without considering how it functioned in reality.

63.     In any event, Defendants leveraged the IRS's favorable determination letter to maintain the guise that the Value Life Plan, as setup by Defendants, was legitimate.

### Troubles Begin: Nature of the Abusive Plan Exposed

64.     The Value Life Plan began to fall apart by the summer of 2006. On June 30, 2006, the IRS served a Notice of Summons on ECI regarding, among other issues, the abusive 412(i) plan established with the Bhatias. Learning this, a worried Moti talked several times in July with representatives at both Lorac and ECI regarding the impact this IRS investigation might have on the Bhatia's personal finances.

65.     During these conversations Lorac and ECI reiterated that the plans were perfectly legal and the audit was routine.

66.     By late August, the IRS had notified the Bhatias that they would be audited.

67.     While preparing for their audit the Bhatias discovered some of Dischino's negligence. This included misguiding them on the validity of the Value Life Plan, multiple improper filings of the Bhatias' returns, falsely claiming to be the Bhatias' legal representative when questioned on the telephone by the IRS, and entering an incorrect amount for 412(i) deductions for 2005, causing an underpayment.

68.     Most importantly, however, the Bhatias learned that the way Defendants implemented the Bhatia's Value Life Plan was considered abusive by the IRS after learning of the Revenue Rulings.

**The Bhatias Begin Preparing for their Audit and Seek Escape from the Plan**

69.     On November 10, 2006, the Bhatias learned that their Plan had an accumulation value (the value they would receive upon cashing out) of only $229,755, even though they had contributed $496,426, a loss of $266,671. The Bhatias decided to cut their losses. Realizing that they had been deceived by their financial advisors—the Defendants—and given the IRS's determination, Dischino's poor accounting, and even decreasing returns on the Value Life Plan, they initiated discussions with Indy Life to switch out of their abusive Plan on November 11, 2006.

70.     The following week, on November 15, the Bhatias, Bob Lang, and ECI had a telephone conference call to determine the best means of terminating the Value Life Plan. While the Bhatias had hoped to keep the Value Life Plan if the insurance policy were terminated, they asked Lang to gather information on comparison and conversions to an individual retirement account or another defined benefit plan.

71.     But Indy Life told the Bhatias that if they failed to pay further premiums their insurance policy would lapse with a cash value of $0. Dischino, Lang, and ECI, through Hartstein, each claimed that, while the insurance policy might not be functioning properly, the Value Life Plan was nonetheless an effective method of saving for retirement. They advised the Bhatias to continue with Plan.

72.     In mid-December 2006, after coming to the conclusion that none of the Defendants was able to give the Bhatias complete information, the Bhatias engaged Gary Young ("Young"), an attorney with Mandelbaum, Salsburg, Gold, Lazris and Discenza, PC, as an advisor.

14

73.     On January 12, 2007, the Bhatias switched to a new insurance policy to fund the Value Life Plan, exchanging their old policy for a new one at a substantial loss in the conversion process. But they kept the Value Life Plan intact under Young's advice, who told them that, although the plan was seriously defective, it was nonetheless a useful way to save for retirement.

### The IRS Determines that the Value Life Plan Was Abusive

74.     During the following ten months, the IRS audited the Bhatias' and Value Life's finances, concluding their investigation on October 11, 2007. On that day, the Bhatias received a letter informing them of three catastrophic issues regarding their plan.

75.     First, the IRS told the Bhatias that it had determined that the Plan was an abusive and impermissible tax haven, not the legitimate retirement option that ECI had devised and marketed and that the Langs had convinced the Bhatias to establish.

76.     This occurred as a result of Pension Strategies' failure to perform their actuarial duties. They were hired to ensure that the Bhatias contributed appropriate sums of money each year. Instead, they miscalculated, causing the Bhatias to put more money in than was legally permissible, resulting in a fine of many thousands of dollars.

77.     Second, the IRS told the Bhatias that Dischino had failed to file Disclosure Form 8886 for the previous two years, carrying fines of up to $900,000. This was the Listed Transaction disclosure form mentioned above which Dischino also failed to mention in the application for a favorable determination letter in early 2005.

78.     Third, Dischino had regularly misfiled forms and been forced to re-file, with penalties for the Bhatias. Dischino had not informed the Bhatias of these initial failures. Specifically, Dischino failed to fail the required Form 8886 in a timely fashion and attempted to cover up his numerous misdeeds.

79.     Finally realizing that they had been duped, the Bhatias immediately and completely dissolved their Value Life Plan, informing the IRS of this move on October 11, 2007.   Beyond wanting to avoid further legal trouble, the Bhatias decided that maintaining such a complicated and problematic tax shelter would have required far too many resources to make it a worthwhile retirement planning strategy.

80.     The IRS demanded that the Bhatias pay $50,196 in penalties for under-reporting as a result of the Value Life Plan.

81.     The IRS fined the Bhatias and Value Life $900,000 for failing to file their Form 8886.  The Bhatias also had to pay back taxes and substantial interest on these back taxes.

82.     Additionally, the Bhatias lost $270,000 after being forced to withdraw from the Indy Life insurance policy and incurring enormous early economic loss.

83.     While Plaintiffs lost enormously, Defendant Dischino has gained an amount, unknown to the Plaintiffs but known to the Defendant, in commissions, direct or indirect, from Indy Life for his role in convincing the Bhatias to enroll in the Plan.

84.     Defendant Lorac gained an amount of money, unknown to the Plaintiffs but known to the Defendant, in commissions from Indy Life for Matt and Bob Lang's role in convincing the Bhatias to enroll in the Plan.

85.    And Defendants ECI and Hartstein have gained an amount of money, unknown to the Plaintiffs but known to the Defendant, in commissions from Indy Life for its role in convincing the Bhatias to enroll in the Plan.

86.    Pension Strategies—the company that was supposed to be properly advising the Bhatias as to an appropriate level of annual contributions—also profited notwithstanding its serious flawed advice.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

## FIRST CLAIM FOR RELIEF

### (Violation of ERISA, 29 U.S.C. §§ 1132(a)(1) and (3))

87.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 86 of the complaint as though fully set forth herein.

88.     The Value Life Plan that was created pursuant to Defendants' advice and assistance is covered by the ERISA, and therefore the Defendants are obligated to comply with the letter and spirit of ERISA.

89.     As illustrated above, Defendants had a fiduciary duty to Plaintiffs with respect to the services rendered by Defendants.

90.     Dischino is a fiduciary under 29 U.S.C. § 1002(21)(A)(ii) by providing investment advice to the Bhatias, beginning with their first meeting to discuss the Value Life Plan. He advised them to create the Value Life Plan and, in turn, the Bhatias paid him for his services.

91.     The Dischino Firm is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) on account of Dischino's involvement in the process as their representative. He advised them to create the Value Life Plan and, in turn, the Bhatias paid him, as a representative of the Dischino Firm, for his services.

92.     Matt Lang is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) by providing investment advice to the Bhatias. He advised them on the validity and functionality of the Value Life Plan and was, in turn, paid for his services.

93.     Bob Lang is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) by providing investment advice to the Bhatias. He advised them on the validity and functionality of the Value Life Plan and was, in turn, paid for his services.

94.     Lorac is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) on account of both Matt and Bob Lang's involvement in the process as their representative. Lorac and the Langs advised the Bhatias on the functionality of the Value Life Plan and, in turn, the Bhatias paid them, as representatives of Lorac, for their services.

95.     ECI is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) by virtue of its actions to establish the framework of the Value Life Plan. In this capacity, ECI created the Value Life Plan and established the connections with Indy Life under which it operated. By directing the opening of the Plan, ECI ordered how the funds would be disposed over the course of the Plan, demonstrating their authority relating to the management of the Plan.

96.     Pension Strategies is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) because of its actions as actuaries of the Value Life Plan. In this capacity, Pension Strategies directed the Bhatias to put specific sums of money into the Value Life Plan, in effect managing the fund. Specifically, Pension strategies specifically directed the Bhatias on how much in contributions to the Value Life Plan would be deductible and, accordingly, how much the Value Life Practice should pay into the Value Life Plan.

97.     As a direct result of Defendants' actions in connection with the creation of the Pension, Plaintiffs were unable to realize the benefits of the Pension as promised by Defendants.

98.     Based upon the foregoing, Plaintiffs are entitled to recover from Defendants, jointly and severally, whatever equitable relief as the Court may deem appropriate in addition to the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, and demand judgment therefore.

**SECOND CLAIM FOR RELIEF**

**(Fraud and Concealment)**

99.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 98 of the complaint as though fully set forth herein.

100.     Defendants, acting separately and in concert, willfully concealed the existence and knowledge of the IRS Revenue Rulings from the Bhatias when they were made.  Moreover, when asked about IRS issues, Defendants said that every aspect of the plan was consistent and compliant with then-current IRS rules and regulations.

101.     Defendants knew or should have known that the Bhatias would not pay the $496,000.00 in premiums had they known of the IRS Revenue Rulings.

102.     By actively concealing the existence and knowledge of the IRS Revenue Rulings, Defendants fraudulently induced the Bhatias to enter into their respective insurance contracts with Defendant Bankers.

103.     Plaintiffs have been damaged by Defendants' fraudulent concealment.

104.     Based upon the foregoing, Plaintiffs are entitled to recover from Defendants, jointly and severally, the return of their premium payments of Four

20

Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, and demand judgment therefore.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

105.   Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 104 of the complaint as though fully set forth herein.

106.   Plaintiffs have been damaged by the aforementioned breach by Defendants of their fiduciary duties to the Bhatias to be truthful, honest and not conceal any material fact which could impact upon their decisions to purchase the subject insurance policies.

107.   Based upon the foregoing, Plaintiffs are entitled to recover from Defendants, jointly and severally, the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, and demand judgment therefore.

## FOURTH CLAIM FOR RELIEF

### (Rescission)

108.   Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 107 of the complaint as though fully set forth herein.

109.   In order to restore the Bhatias to their rightful position, it is necessary to rescind the subject insurance policies, *ab initio*.

110.   Based upon the foregoing, Plaintiffs are entitled to recover from Defendants, jointly and severally, the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, and demand judgment therefore.

### CAUSES OF ACTION AGAINST
### DISCHINO, DISCHINO AND ASSOCIATES, ROBERT LANG,
### MATTHEW LANG, AND LORAC FINACIAL SERVICES, INC.

### FIFTH CLAIM FOR RELIEF

**(Professional Negligence / Malpractice)**

111.   Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 110 of the complaint as though fully set forth herein.

112.   Defendants Dischino, the Langs, and Lorac Financial Services, Inc. owed a duty to provide advice had a fiduciary duty to the Bhatias and the Value Life Plan to provide proper and competent accounting and tax advice services.

113.   Defendants Dischino and the Langs either lacked the requisite skill to render the same, or failed to properly utilize the skills he possessed, in failing to advise the Bhatias of the tax consequences associated with creating and maintaining the Value Life Plan.

114.   Dischino breached his duty to the Bhatias and the Value Life Plan by accepting payment from ECI for referring them to ECI, as Dischino admitted in a prior deposition.

22

115.    Dischino further breached his duty to the Bhatias and the Value Life Practice by negligently failing to follow the required Form 8886 to indicate that the Bhatias and the Value Life Practice had participated in a listed transaction.

116.    The Bhatias made Dischino and the Langs aware of all of their decisions with respect to the purchase of the subject policies prior to their purchase.

117.    As accountants, Defendants Dischino and the Langs had a duty to keep abreast of IRS Revenue Rulings, including the ones issued on February 13, 2004.

118.    Had Defendants Dischino and the Langs properly advised the Bhatias of the IRS Revenue Rulings or other deficiencies in the policies, including the taxable costs associated therewith, they would not have purchased the policies.

119.    Moreover, but for Dischino's failure to file the Form 8886 with the IRS, the Bhatias and Value Life Practice would not have been fined hundreds of thousands of dollars by the IRS.

120.    Said failure was a direct result of Dischino's and the Langs' failure to possess the adequate education, skill, care and training, or, having possessed the same, to properly utilize said education, skill care and training to properly advise the Bhatias as aforesaid.

121.    Defendant Dischino's and the Langs' actions by commission and/or omission as set forth hereinabove, constitute malpractice.

122.    The Bhatias have been damaged by the aforesaid malpractice of Defendants Dischino and the Langs and demand judgment in an amount to be determined by this Court at the time of trial, but not less Four Hundred Ninety-Six

Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, together with the costs and reasonable attorneys' fees necessary to recoup any and all sums from Defendants Dischino, the Langs, and Lorac.

### CAUSES OF ACTION AGAINST ECI, KENNETH HARTSTEIN, AND PENSION STRATEGIES

### SIXTH CLAIM FOR RELIEF

#### (Negligence)

123.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs 1 through 122 of the complaint as though fully set forth herein.

124.    Defendants ECI and Hartstein owed the Bhatias and the Value Life Plan a duty of care to exercise reasonable care under the circumstances to devise, develop, market, and sell a 412(i) plan that was reasonably suited to the needs of Plaintiffs.

125.    Defendants ECI and Hartstein owed the Bhatias and the Value Life Plan a further duty of care to ensure that ECI's Pendulum Plan would provide the Bhatias and the Value Life Plan with benefits promised to them by ECI and any persons or entities acting on ECI's behalf.

126.    Defendants ECI and Hartstein breached their duty of care to the Bhatias and the Value Life Plan by failing to design a 412(i) plan suitable to Plaintiffs' needs and wishes and by further failing to take adequate precautions to ensure that Plaintiffs would not be subjected to any adverse action by the IRS in connection with Plaintiffs' Value Life Plan.

127.    As a result of Defendants ECI and Hartstein's misconduct, the Bhatias were misled into establishing and maintaining a 412(i) plan—the Value Life Plan—which turned out to be an imprudent and costly mistake.

128.    Defendant Pension Strategies owed the Bhatias and the Value Life Practice a duty of care to carefully and deliberately determine a permissible amount of money which the Bhatias, through the Value Life Practice, could legally contribute to the Value Life Plan and remain compliant with any IRS regulations.

129.    Defendant Pension Strategies breached this duty of care by incorrectly determining, and then communicating, how much the Bhatias, through the Value Life Practice, could permissibly contribute to the Value Life Plan.

130.    As a result of Defendant Pension Strategies's misconduct, the Bhatias, through the Value Life Practice, made excess contributions to the Value Life Plan and took impermissibly high tax deductions, thereby resulting in penalties from the IRS.

131.    Due to Defendants' negligence in designing, distributing, administering, and advising the Bhatias in connection with the Value Life Plan, the Bhatias and the Value Life Practice were seriously damaged and demand judgment in an amount to be determined by this Court at the time of trial, but not less Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, together with the costs and reasonable attorneys' fees necessary to recoup any and all sums from Defendants ECI, Kenneth Hartstein, and Pension Strategies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Radha Bhatia and Moti Bhatia, individually and as Trustees of the Value Life Psychological Services Employees' Pension Trust demand judgment against Defendants, Harold Dischino, Dischino and Associates, PC, Robert Lang, Matthew Lang, Lorac Financial Services, Inc., Economic Concepts, Inc., and Pension Strategies, LLC, jointly and severally as follows:

(a) On the First Cause of Action grounded in a violation of ERISA, whatever equitable relief as the Court may deem appropriate in addition to the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest;

(b) On the Second Cause of Action grounded in fraudulent concealment and inducement, the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest;

(c) On the Third Cause of Action grounded in breach of fiduciary duty, the return of their premium payments of Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest;

(d) On the Fourth Cause of Action, the rescission of the subject policies and thereupon, the return of their premium payments of Four Hundred Ninety-Six

Thousand Dollars ($496,000.00) and remuneration for the amount, to be determined at trial, paid in taxes and fines, with interest, and demand judgment therefore.;

(e) On the Fifth Cause of Action, against Defendants, grounded in professional malpractice, in an amount not less than Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and the amount, to be determined at trial, paid in taxes and fines, with interest, together with the costs and reasonable attorneys' fees necessary to recoup any and all sums from Defendants Harold Dischino, Dischino and Associates, PC, Robert Lang, Matthew Lang, and Lorac Financial Services, Inc.;

(e) On the Sixth Cause of Action, against Defendants, grounded in negligence, in an amount not less than Four Hundred Ninety-Six Thousand Dollars ($496,000.00) and the amount, to be determined at trial, paid in taxes and fines, with interest, together with the costs and reasonable attorneys' fees necessary to recoup any and all sums from Defendants Economic Concepts, Inc., Kenneth Hartstein, and Pension Strategies, LLC;

(f) Punitive damages in an amount to be determined at trial;

(g) Costs, disbursements and reasonable attorneys' fees related to this action; and

(h) Such other and further relief as to this Court may seem just, proper and equitable.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: New York, New York
       November 14, 2008

                    Respectfully submitted,


                    Yasmeen A. Allen (03367-07)
                    William S. Holleman*
                    **BALESTRIERE LANZA PLLC**
                    225 Broadway, Suite 2900
                    New York, NY 10007
                    Telephone:   (212) 374-5400
                    Facsimile:    (212) 208-2613
                    *Attorneys for the Plaintiffs*

---

* Admission pending *pro hac vice.*