UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RADHA BHATIA, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:09-CV-1086-B |
| | § | |
| HAROLD DISCHINO, et al., | § | (part of MDL No. 1983) |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendants Indianapolis Life Insurance Company's ("Indianapolis Life")

Motion for Judgment on the Pleadings (doc. 82) and Defendants Kenneth Hartstein and Economic

Concepts, Inc.'s (collectively "ECI") Motion for Judgment on the Pleadings (doc. 87). For the

reasons stated below, the Court finds that Indianapolis Life's Motion should be and hereby is

**GRANTED**. The Court finds that ECI's Motion should be and hereby is **GRANTED IN PART**

and **DENIED IN PART**.

## I.

## BACKGROUND[1]

This case is before the Court as a result of a forum transfer from a federal district court in

New Jersey to this Court by the Multidistrict Litigation Panel. This action arises out of Plaintiffs'

purchase of a tax shelter investment plan.

---

[1]The Court takes its factual account from the allegations contained in the First Amended Complaint ("FAC") filed January 20, 2009.

A.      *Establishment of the Value Life Plan*

The plaintiffs in this action are psychologist Radha Bhatia, her husband Motilal Bhatia, and Radha Bhatia's private psychology practice Value Life Psychological Services, LLC (collectively "Plaintiffs" or "the Bhatias").[2] FAC ¶¶ 21-23. In October 2004, Radha and Motilal Bhatia conferred with accountant Ron Markovich ("Markovich") of Dischino and Associates, P.C. as to any actions they should take with regard to their finances. *Id.* at ¶ 34. Markovich recommended that the Bhatias consider establishing a § 412(i) retirement plan. *Id.* at ¶ 35.

A § 412(i) plan is a retirement plan frequently utilized by small professional service companies that offers attractive tax benefits. *Id.* at ¶ 37. Such plans are considered "defined benefit plans" because they provide a defined level of benefits upon retirement. *Id.* The plans are unique because they are comprised entirely of annuities or life insurance contracts. *Id.* Notably, because the § 412(i) plans can potentially serve as abusive tax shelters, the IRS has cautioned against the potentially illegal use of such plans since 1989. *Id.* at ¶ 39. On February 13, 2004, the IRS specifically issued Revenue Rulings 2004-20 and 2004-21 to address such abuses. *Id.* at ¶ 44.

Upon Markovich's recommendation, the Bhatias met with Harold Dischino ("Dischino") of Dischino and Associates, P.C. to further discuss the establishment of a § 412(i) plan. *Id.* at ¶ 47. Dischino emphasized the plan's benefits and assured the Bhatias the plans were approved by the IRS. *Id.* at ¶¶ 49-50. In December 2004, the Bhatias met with Robert Lang, a financial advisor at Lorac Financial Services, to further discuss the potential benefits of establishing a § 412(i) plan. *Id.* at ¶¶

---

[2]The Defendants in this action are Harold Dischino, Dischino and Associates, P.C., Robert Lang, Matthew Lang, Lorac Financial Services, Inc. ("Lorac"), Kenneth Hartstein, ECI, Pension Strategies, LLC ("Pension Strategies"), and Indianapolis Life. All claims and cross claims against Defendant Robert Lang were dismissed on December 8, 2010 for failure to file a valid return of service.

27, 51-52. Robert Lang and Matt Lang ("the Langs") contacted ECI, an executive benefit planning company, Pension Strategies, a company that helps in the administration and management of retirement plans, and Indianapolis Life to help the Bhatias make their decision to establish a § 412(i) plan and purchase the insurance policy to fund the plan. *Id.* at ¶¶ 4, 29-31.

In late 2004, the Bhatias decided to proceed with establishing a § 412(i) plan. *Id.* at ¶ 54. Accordingly, the Langs worked with ECI, Pension Strategies, and Indianapolis Life to establish the plan. *Id.* at ¶¶ 54, 56. As part of establishing the Bhatias' § 412(i) plan, the Langs proposed a model under which the Bhatias would make minimum contributions of $360,107 per year. *Id.* at ¶¶ 55, 57. None of the Defendants ever mentioned the possibility that the § 412(i) plan could be considered an abusive tax shelter or that the IRS required the filing of certain forms in conjunction with such plans.[3] *Id.* at ¶¶ 58-59, 61. Subsequently, the Bhatias determined that the proposed minimum contribution would be too expensive for their budget. *Id.* at ¶ 62. Accordingly, Matt Lang, Robert Lang, ECI, and Pension Strategies allegedly conspired together to modify the annual contribution level to $248,212. *Id.* On March 30, 2005, the Bhatias officially established their § 412(i) plan (the "Value Life Plan" or "Plan"). *Id.* at ¶ 63. On October 25, 2005, the Bhatias received notice of a favorable determination by the IRS as to the Value Life Plan. *Id.* at ¶ 65.

---

[3]In its Motion for Judgment on the Pleadings, Indianapolis Life states that the Bhatias signed a Disclosure, Acknowledgment and Agreement form ("Disclosure Form") upon purchasing their policy. Indianapolis Life argues this Disclosure Form expressly advised the Bhatias of recent IRS guidance and risks associated with using a life insurance policy to fund a § 412(i) plan and advised them to consult their own tax and legal advisors regarding the tax consequences of the plan, including whether it must be disclosed as a "listed transaction." *See* Indianapolis Life Mot. 5-7 (citing Indianapolis Life Mot. Ex. 1). The Bhatias do not dispute that they signed the Disclosure Form but argue that the Disclosure does not absolve Indianapolis Life of liability. Pls.' Opp'n Indianapolis Life Mot. 18-21.

B.      *IRS Investigation*

On June 30, 2006, the IRS served a Notice of Summons on ECI regarding the Value Life Plan. *Id.* at ¶ 68. Subsequently, the Bhatias were notified they would be audited by the IRS. *Id.* at ¶ 70. In preparing for the audit, the Bhatias discovered that the Value Life Plan reflected multiple questionable practices on the part of Dischino. *Id.* at ¶¶ 69, 71. Further, the Bhatias learned the Value Life Plan was operating in a way considered abusive by the IRS. *Id.* at ¶ 72.

On October 11, 2007, the IRS concluded its audit investigation and recognized three major issues at play in the Value Life Plan. *Id.* at ¶ 78. First, the Value Life Plan was operating as an abusive and impermissible tax haven. *Id.* at ¶ 79. This fact was allegedly the result of Pension Strategies' failure to correctly perform their actuarial duties. *Id.* at ¶ 80. Second, Dischino had failed to file Disclosure Form 8886 for the Value Life Plan for the previous two years – a filing required by the IRS. *Id.* at ¶ 81. Third, Dischino had regularly misfiled forms and been forced to re-file, incurring penalties for the Bhatias without their knowledge. *Id.* at ¶ 82. Upon receiving the letter from the IRS, the Bhatias completely dissolved the Value Life Plan and informed the IRS of its dissolution on October 11, 2007. *Id.* at ¶ 83. Ultimately, the Bhatia's establishment of the Value Life Plan proved very costly in fines and losses. *Id.* at ¶¶ 84-86. The Bhatias were subject to $50,196 in penalties for under-reporting and $900,000 in penalties for failure to file Form 8886, as well as other back taxes and interest. *Id.*

C.      *Transition to Vista Advantage Policy*

Once the Bhatias became aware of the IRS Notice of Summons and the IRS's intent to audit them, they became concerned about the impact the IRS investigation and audit would have on their finances. *Id.* at ¶ 68. Lorac and ECI reiterated that the plans "were perfectly legal and the audit was

routine," but the Bhatias discovered some of Dischino's negligence while preparing for their audit and also learned that "the way Defendants implemented the Bhatia's Value Life Plan was considered abusive by the IRS after learning of the Revenue Rulings." *Id.* at ¶¶ 69, 71-72.

On November 10, 2006, the Bhatias learned that the accumulation value of their Plan, or the value they would receive upon cashing out, was only $229,755 even though they had contributed $496,426, which would result in a loss of $266,671. *Id.* at ¶ 73. The Bhatias then decided to "cut their losses" in light of the Defendants' deception, the IRS's determination, Dischino's poor accounting, and decreasing returns of the Value Life Plan. *Id.* The Bhatias and the Defendants then proceeded to discuss options for terminating the Value Life Plan or alternative retirement investment options they could pursue. *Id.* at ¶¶ 74-75. Indianapolis Life explained to the Bhatias that if they discontinued premium payments on their insurance policy, the policy would lapse with a cash value of $0, and Indianapolis Life limited the Bhatias to selecting another Indianapolis Life policy if they wanted to change their Plan. Id. at ¶¶ 75, 92. Dischino, Lang, and ECI, through Matt Lang, advised the Bhatias to continue with the Plan. *Id* at ¶ 75.

The Bhatias eventually concluded that none of the Defendants could provide them with complete information, and they therefore hired Gary Young, a partner with the law firm of Mandelbaum, Salsburg, Gold, Lazris and Discenza, PC ("Mandelbaum") as an advisor who apparently advised them regarding how to proceed in their dispute with Indianapolis Life. *Id.* at ¶ 76. When presenting the Bhatias with the option of exchanging their policy, Indianapolis Life sent the Bhatias a Vista Advantage Policy Illustration ("Policy Illustration" or "Illustration") listing an assumed weighted average interest rate of 7.9%, meaning that a policy holder could expect that cash

contained in the policy would increase each year at a rate of 7.9%.[4] *Id.* at ¶ 94; *see also* Indianapolis Life Mot. Ex. 2 (Policy Illustration). Indianapolis Life knew that potential insureds would rely on this assumed interest rate even though it knew that it would be difficult to maintain this rate throughout the life of the policy. *Id.* at ¶¶ 95-96. In reliance on this assumed interest rate, and on the advice of their attorney Young, on January 12, 2007 the Bhatias surrendered their original policy for a new "Vista Advantage" policy, though the new policy failed to perform as advertised. *Id.* at ¶¶ 77, 97-98. This exchange resulted in $270,000 in further losses to the Bhatias. *Id.* at ¶ 86.

Pursuant to that exchange, the Bhatias signed an agreement and release ("Release") on January 12, 2007, which was transmitted to AmerUS on January 15, 2007 by Thomas W. Ackerman, another partner at Mandelbaum. Indianapolis Life Mot. Ex. 3 (attaching transmittal letter and Release). The Release stated that the Bhatias, in exchange for Indianapolis Life's exchange of the Bhatias' prior policy for a Vista Advantage policy and "to resolve any actual or potential dispute(s) that [the Bhatias] may have with [Indianapolis Life]," Release at 1, agreed to "hereby generally release, acquit, hold harmless and forever discharge [Indianapolis Life] from any and all actions, causes of action, claims, damages, liabilities, suits, and demands of any nature whatsoever . . . ." Release at ¶ 3. This release included any contract or tort claims, known or unknown, that:

> arise out of or in any way relate to the offer, sale, purchase, performance and/or use of the Current Policy, the New Policy, the Plan, and/or the surrender of the Current Policy for the New Policy, including without limitation representations relating to the Plan or the adoption of the Plan, including any existing or potential or future

---

[4]Although the First Amended Complaint alleges that the Policy Illustration listed an average rate of return of 7.9%, the actual Illustration lists other assumed interest rates in addition to the 7.9% figure. *See, e.g.,* Policy Illustration 12 (listing 7.9% interest rate for years 7 through 69 for the "Basic Interest Strategy" but slightly lower rates for years 1 through 6). The Court refers to the 7.9% figure as alleged in the complaint but recognizes that the actual illustrated rates vary somewhat.

economic, legal or tax consequences (including without limitation claims for tax liabilities, tax penalties or interest resulting there from) or representations thereof….

*Id.* Further, in granting this release, the Bhatias stated that they acknowledged that:

[T]he Current Policy, the Plan, the surrender of the Current Policy for the New Policy, and the New Policy may involve complex economic, legal and tax issues and [the Bhatias], individually and collectively represent that [they] agree that they should and that they have, in fact, received independent professional advice on such economic, legal and tax issues from advisors who are independent of [Indianapolis Life] . . . .

[The Bhatias] further acknowledge and expressly state that [they] have not relied on economic, legal or tax advice, if any, given by [Indianapolis Life] . . . in connection with the purchase or use of the Current Policy and/or the New Policy, the adoption of the Plan, and/or the surrender of the Current Policy for the New Policy, including but not limited to the matters addressed in this Agreement.

*Id.* at ¶ 2. The Release also explained that the Vista Advantage Policy Illustration "contains projections and any non-guaranteed elements illustrated are subject to change and the financial results could be either higher or lower." *Id.* at ¶ 7. The Release further stated that "[e]ach party acknowledges that [they are] signing this Agreement voluntarily, after reading this Agreement carefully, and after receiving advice of counsel, all without being subject to duress of any kind." *Id.* at ¶ 6. The Bhatias also acknowledged that "no representation, warranty or promise of any kind or character has been made to induce an execution of this Agreement, other than as stated in this Agreement" and agreed that the Release and the terms and conditions of the replacement policy "constitute the full, complete and entire agreement and understanding of the Parties, and supersede all prior or contemporaneous agreements between the Parties relating to the subject matter of this Agreement . . . ." *Id.* at ¶¶ 6, 8. The Release concludes by stating that the parties agree that "this Agreement may be pled as and is a complete defense and bar to any action or proceeding of any kind

that may be taken on any claim released by this Agreement . . . ." *Id.* at ¶ 8. Indianapolis Life argues

that this Release bars the claims the Bhatias assert against it in the First Amended Complaint.

D.    *The Instant Action*

On January 20, 2009, the Bhatias filed their First Amended Complaint asserting claims for

violations of the Employee Retirement Income Security Act ("ERISA"), fraud and concealment,

breach of fiduciary duty, and rescission against all Defendants. *Id.* at ¶¶ 100-129. The Bhatias further

assert claims of "professional negligence/malpractice" against Dischino, Dischino and Associates,

P.C., ECI, Robert Lang, Matthew Lang, and Lorac, negligence against ECI and Pension Strategies,

and fraudulent inducement against Indianapolis Life. *Id.* at ¶¶ 130-158.[5]

Indianapolis Life filed its Motion for Judgment on the Pleadings on June 28, 2010 and ECI

filed its Motion for Judgment on the Pleadings on August 8, 2010, seeking to dismiss the Bhatias'

claims under Federal Rules of Civil Procedure 12(c) ("Rule 12(c)") and 9(b) ("Rule 9(b)"). Having

considered the Parties' briefing and the relevant law, the Court now turns to the merits of its

decision.

## II.

## LEGAL STANDARD

A.    *Law Applicable in MDL Cases*

Because the Court is hearing this action as a result of a forum transfer by the Multidistrict

Litigation Panel, if called upon to address matters of state law, the Court is bound to apply the state

law of the transferor forum. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal*

---

[5]The parties have also filed various crossclaims and counterclaims, which are not subjects of the instant motions for judgment on the pleadings.

*Practice and Procedure* ("Wright & Miller") § 3866 (2007) (citing *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 576 (5th Cir. 1996)); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (other citations omitted). As to matters of federal law, however, it is the law of the transferee court that governs. *Menowitz*, 991 F.2d at 40 (citing *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175-76 (D.C. Cir. 1987) (other citations omitted)). Thus, because pleading requirements are purely matters of federal law, the Court looks to the law of the transferee court – this Circuit – for controlling Rule 12(c) and Rule 9(b) standards. *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 623 (N.D. Ill. 2008) (noting pleading requirements in federal courts are governed by the federal rules and not by state law).

B.      *Motions for Judgment on the Pleadings Under Rule 12(c)*

A party may move for judgment on the pleadings after the pleadings are closed and when doing so would not delay the trial. FED. R. CIV. P. 12(c). A motion brought pursuant to Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co., Inc. v. Touchstone Props. Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (citations omitted). A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995).

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The Court

accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). However, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). Therefore, to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Id.* (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

C.      *Motions to Dismiss Under Rule 9(b)*

        Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The amount of particularity required to sufficiently plead fraud differs based upon the context of each case. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, generally Rule 9(b) requires a specification as to which statements were fraudulent, the identity of the speaker, when and where the statements were made, and an explanation as to why the statements were fraudulent. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). This standard has been analogized to the essential requirements of the first paragraph of a newspaper article – the "who, what, where, when and how" of the alleged fraud. *Melder v. Morris*, 27 F.3d 1097, 1100 n. 5 (5th Cir. 1994).

## III.

## ANALYSIS

In their Motions for Judgment on the Pleadings, Indianapolis Life and ECI argue that all claims against them should be dismissed. Accordingly, the Court will consider the allegations against both parties after preliminarily addressing the exhibits attached to Indianapolis Life's and ECI's Motions.

A.      *The Exhibits Attached to Indianapolis Life's and ECI's Motions for Judgment on the Pleadings*

Indianapolis Life attaches copies of the Value Life Psychological Services, LLC Defined Benefit Pension Plan's "Disclosure, Acknowledgment and Agreement not to hold liable," the Vista Advantage Policy Illustration provided to Radha Bhatia, and the Agreement and Release signed by the Bhatias in 2007 as well as the accompanying cover letter signed by the Bhatias' attorney, Thomas W. Ackerman. Indianapolis Life Mot. Exs. 1-3. ECI attaches the "Value Life Psychological Services, LLC Defined Benefit Pension Plan." ECI Mot. Ex. A. Court may consider documents attached to a motion to dismiss but not included in the complaint if such documents are referenced in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). The Bhatias repeatedly reference representations made by Indianapolis Life and ECI regarding their § 412(i) plan, the Vista Advantage Policy, and the Release as well as their reliance on these representations in the First Amended Complaint. Furthermore, the Bhatias do not argue that these documents are not properly before the Court at this time, nor do they dispute their authenticity. Given that these attached documents are referenced in the Bhatias' complaint, concern their reliance on representations allegedly made to them, and are central to their

claims, the documents are properly before the Court and will be considered in deciding Indianapolis Life's and ECI's Motions.

B.      *The Agreement and Release of Claims Against Indianapolis Life*

Indianapolis Life argues that all claims against it must be dismissed in light of, *inter alia*, the Release signed by the Bhatias on January 12, 2007, which it argues bars all claims against it by the Bhatias over their initial policy, the subsequent conversion of the policy into the Vista Advantage policy, and the performance of the Vista Advantage policy. Indianapolis Life also points out that the First Amended Complaint alleges that the Bhatias were represented by counsel who gave them advice regarding the Plan and the exchange of the insurance policy used to fund the Plan at the time they signed the Release. Further, Indianapolis Life argues that there was no misrepresentation of the interest rate and that the Bhatias could not have reasonably relied on the illustrated interest rates in light of the disclaimers in the Illustration. In response, the Bhatias claim that the Release is invalid because it was procured by fraud, was an enforceable contract of adhesion, and was an exculpatory waiver that is void as against public policy.

        i.      Procured By Fraud?

Under New Jersey law, "it is the general rule that where a party affixes his signature to a written instrument, such as a release, a conclusive presumption arises that he read, understood and assented to its terms and he will not be heard to complain that he did not comprehend the effect of his act in the signing." *Cooper v. Borough of Wenonah*, 977 F. Supp. 305, 311-12 (D.N.J. 1997) (and citations therein). However, an exception to the presumptive conclusion in a release "arises when there is fraud, misrepresentation, overreaching by the releasee, incapacity of the releasor affecting his ability to understand the release, or any other equitable ground." *Id.* at 313; *McKenna v. Montclair*

- 12 -

*Police & Firemen's Pension Comm'n*, 1 A.2d 756, 757 (N.J. 1938) (same); *see also Peter W. Kero v.*
*Terminal Constr. Corp.*, 78 A.2d 814, 817 (N.J. 1951) (where a party is induced to sign a release by
reason of a misrepresentation, the signer has a right to set up such fraud to avoid such release when
there is an attempt to use it against him by the releasee, "even though the signer might have
discovered the fraud perpetrated upon him by reading the paper and was negligent in omitting to do
so."). However, in order to meet this exception, the Bhatias must sufficiently plead that they were
fraudulently induced to sign the Release.[6] Accordingly, the Court looks to the First Amended
Complaint's allegations that Indianapolis Life fraudulently induced the Bhatias to agree to the
Release.

Under New Jersey law, to establish common law fraud, a plaintiff must allege "(1) a material
misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its
falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other
person; and (5) resulting damages." *Banco Popular N.A. v. Gandi*, 876 A.2d 253, 260 (N.J.
2005) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)). "The 'deliberate
suppression of a material fact that should be disclosed' is viewed as 'equivalent to a material
misrepresentation (i.e., an affirmative misrepresentation),' which will support a common law fraud
action." *Winslow v. Corporate Express, Inc.*, 834 A.2d 1037, 1044 (N.J. Super. Ct. App. Div.
2003) (quoting *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 725 A.2d 1133, 1139 (N.J. Super. Ct. App.
Div. 1998)).

---

[6]As a initial matter, the Court must distinguish between the Bhatias' allegations of fraud in connection
with the initial establishment of the Value Life Plan as opposed to their allegations of fraud in connection with
the Release. If the Release is valid, their claims in connection with the establishment of the Plan would be
barred even if Indianapolis Life committed fraud when the Plan was established.

Yet while the Court looks to New Jersey law for the substantive elements of the fraud claim, the law of the Fifth Circuit applies to the extent the Defendants are challenging the pleadings under Rule 9(b)'s pleading requirements. *See Menowitz*, 991 F.2d at 40 (citing *In re Korean Air Lines Disaster*, 829 F.2d at 1175-76) (other citations omitted). In the Fifth Circuit, Rule 9(b) requires a specification as to which statements were fraudulent, the identity of the speaker, when and where the statements were made, and an explanation as to why the statements were fraudulent. *Southland Sec. Corp.*, 365 F.3d at 362.

The Bhatias argue that the Release was procured through fraud because Indianapolis Life distributed the Illustration representing that the average rate of return of the policy would be 7.9% over the life of the policy, knowing that the actual rate would be lower and knowing that the Bhatias would rely on this illustrated 7.9% rate. FAC ¶¶ 91-99, 151-158. They also argue that the Release was procured through fraud because Indianapolis Life represented that the Bhatias would lose their entire contribution to their Value Life Plan if they did not switch to another Indianapolis Life insurance policy. FAC ¶ 92. The Bhatias further allege that in reliance on the misrepresentations, they surrendered their original policy in exchange for a new Vista Advantage policy. *Id.* at ¶ 97. Indianapolis Life argues that the fraudulent inducement claim should be dismissed for failure to plead the reasonable reliance element of fraudulent inducement given the express disclosure on the Illustration that the 7.9% interest rate was a non-guaranteed assumption subject to change.[7]

---

[7]The Bhatias also allege in their response brief that Indianapolis Life induced them to sign the Release by omitting material facts during the policy exchange. Specifically, the Bhatias claim that Indianapolis Life withheld the information that the Bhatias were subject to reporting requirements when they set up their Value Life Plan and continued to withhold this information when the Bhatias switched to the Vista Advantage Policy. Pls.' Opp'n Indianapolis Life Mot. 25 (citing FAC ¶¶ 6, 84-86). Such allegation is largely duplicative of their fraud claim regarding the Value Life Plan. Additionally, this claim regarding the withholding of

(continued...)

The Court finds the Bhatias' allegations of fraudulent inducement insufficient under both Rule 9(b) and Rule 12(c). First, to the extent that the Bhatias argue that Indianapolis Life fraudulently represented that the Bhatias were limited to exchanging their existing policy for another Indianapolis Life policy, the Bhatias have not alleged why these representations were false when made. Second, to the extent that the Bhatias allege that they were fraudulently induced to sign the Release based solely on the Policy Illustration, the Court finds that there was no misrepresentation of a material fact – the Illustration plainly states several times that the assumed interest rates are non-guaranteed. Most importantly, the Bhatias have not sufficiently alleged reasonable reliance on Indianapolis Life's alleged misrepresentations regarding the interest rate of the replacement policy. The Illustration upon which the Bhatias relied states in bold lettering throughout that the guaranteed interest rate was 2% and that the assumed interest rate of 7.9% was non-guaranteed and subject to change. *See, e.g.*, Policy Illustration at 2 ("The guaranteed interest rate is 2% for the Basic Interest Strategy and each Fixed Term Strategy. For each Indexed Strategy, a minimum interest rate of 2% is guaranteed . . . ."), *id.* at 4 (weighted average assumed rate for first year is 7.2% but future performance may be greater or less than yields shown); *id.* at 11 (acknowledgment from Radha Bhatia at time of receipt of Policy Illustration that she understood that any non-guaranteed elements

---

(...continued)

information at the time of the policy conversion is not alleged in the First Amended Complaint. A plaintiff may not amend its complaint through a response to a motion to dismiss, and therefore the Court does not consider this allegation when deciding the effect of the Release. *See Skidmore Energy, Inc. v. KPMG LLP*, 2004 WL 3019097, at *5 (N.D. Tex. Dec. 28, 2004) (and cases cited therein). Further, such allegation of fraud also conflicts with the Bhatias' statement in the Release that they "acknowledge that there may have been, are and/or may be economic, legal or tax consequences arising from or relating to" their participation in the Plan and policy exchange; that they "received independent professional advice on such economic, legal, and tax issues;" and that they were not relying on any tax, economic, or legal advice from Indianapolis Life even if any had been given. *See* Release ¶ 2.

illustrated are subject to change and could be higher or lower). The terms of the Release also specifically state that "[t]he illustration contains projections and any non-guaranteed elements illustrated are subject to change and the financial results could be higher or lower." Release at ¶ 7. In light of these express statements in both the Illustration and the Release, the Bhatias could not have reasonably relied on any representations that the 7.9% interest rate was guaranteed. *See In re Nw. Mut. Life Ins. Co. Sales Pracs. Litig.*, 70 F. Supp. 2d 466, 489 (D.N.J. 1999)(no reasonable reliance where oral misrepresentations were contradicted by a disclaimer, in bold letters, that the figures assumed in illustration were not guaranteed); *St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n*, 2005 WL 1199045, *7 (D.N.J. May 18, 2005)(no reasonable reliance upon alleged misrepresentations which were expressly contradicted by the terms of the agreement*; Andrea v. Metro. Life Ins. Co.*, 2000 WL 35361960, at *3-4 (D.N.J. Aug. 14, 2000) (reliance unreasonable where a "quick perusal" of the policy would have alerted plaintiff to terms contradictory to alleged representations).

Further, when an insured person receives an insurance policy, that person is "under a duty to examine his insurance policies; if the terms disclosed by such an examination are inconsistent with his desires, he is required to notify the company of the inconsistencies and of his refusal to accept the policy in the proffered condition." *Andrea*, 2000 WL 35361960, at *3 (quoting *Martinez v. John Hancock Mut. Life Ins. Co.*, 367 A.2d 904, 909 (N.J. Super. Ct. App. Div. 1976)); *see also Delaney v. Am. Express Co.*, 2007 WL 1420766, at *6 (D.N.J. May 11, 2007) (insurance customers had obligation to examine documents to protect themselves from any potential oral misrepresentations made by the insurance company's agents). While "the insured is bound only to make such examination as would be reasonable for the average person under the particular circumstances, and

- 16 -

he will only be held to that to which he would be thereby alerted," *Harr v. Allstate Ins. Co.*, 255 A.2d 208, 220-21 (N.J. 1969), in this instance the representations regarding the performance of the replacement policy were straightforward and uncomplicated, warning the Bhatias that the rate was not guaranteed and subject to change.[8]

The Court rejects any attempt by the Bhatias to allege representations outside of the terms of the Policy Illustration and the Release, as any evidence regarding these representations, to the extent that the Bhatias allege that Indianapolis Life guaranteed a 7.9% interest rate, is excluded under New Jersey's parol evidence rule. New Jersey law states that a parol agreement which is contradictory to the express words of a contemporaneous or subsequent written contract is inadmissible. *See Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 598 A.2d 1234, 1235-36 (N.J. Super. Ct. App. Div. 1991); *Peterson v. Mister Donut of Am., Inc.*, 1988 WL 71734, at *5 (D.N.J. July 6, 1988). The express terms of the Illustration and Release state that the assumed interest rates were non-guaranteed and subject to change, and extrinsic evidence tending to show that the parties agreed that the interest rates were guaranteed would alter or vary the express terms of the contract. *See, e.g., Filmlife*, 598 A.2d at 1235-1237 (upholding dismissal of fraud claim where plaintiff sought to introduce extrinsic evidence which contradicted express terms of integrated agreement). This is especially true in light of the Release's integration clause stating that the Release "and the terms and conditions of the New Policy constitute the full, complete and entire agreement and understanding of the Parties, and supersede all prior or contemporaneous agreements between the Parties relating to the subject matter" of the Release. Release ¶ 8.

---

[8]The Bhatias were also represented by counsel and had a pre-existing dispute with Indianapolis Life, further undermining their claims of reliance on these "assumed non-guaranteed" interest rates.

Overall, in light of the express language of the Policy Illustration and the Release, the Court finds that any reliance on the non-guaranteed interest rates, whether contained in the Policy Illustration or made orally, is unreasonable as a matter of law. Accordingly, the Bhatias have not properly alleged that they were fraudulently induced to sign the Release.

ii.    Contract of Adhesion?

As alternative grounds for holding the Release unenforceable, the Bhatias argue that the Agreement and Release should be held unenforceable because it is an unconscionable contract of adhesion. Pls.' Opp'n Indianapolis Life Mot. 26-28. Particularly, the Bhatias contend that the Release is procedurally unconscionable due to Indianapolis Life's alleged bargaining tactics, specifically its misrepresentation of the true average interest rate and omission of material information during the conversion process, including the use of "partners to whom it paid substantial commissions to convince the Bhatias to stay with [Indianapolis Life] by concealing the true nature and consequences of the IRS audit." *Id.* at 27 (citing FAC ¶¶ 6, 11, 42, 74-75, 94-96). They contend that Release is also substantively unconscionable because it required them to continue paying for an "excessive and completely unsuitable amount of life insurance in order to avoid simply forfeiting the hundreds of thousands of dollars already paid into the plan."[9] *Id.* at 27 (citing FAC ¶ 92).

New Jersey courts recognize unconscionability as a basis for invalidating a contract. *See Saxon Constr. & Mgmt. Corp. v. Masterclean of N.C., Inc.*, 641 A.2d 1056, 1058 (N.J. Super. Ct. App. Div.

_____

[9]Although the Bhatias correctly note that under New Jersey law, insurance contracts are contracts of adhesion, Pls.' Opp'n Indianapolis Life Mot. 26, the Release signed by both parties is not an insurance contract and is therefore not a *per se* contract of adhesion. Further, there is no indication that the Release itself was presented on a take-it-or-leave-it basis, in a standardized form that the Bhatias were required to accept or reject as is. *See, e.g., Stelluti v. Casapenn Enters.*, 975 A.2d 494, 502 (N.J. Super. Ct. App. Div. 2009), *aff'd*, 1 A.3d 678 (N.J. 2010) (discussing adhesion contracts).

1994) (courts may refuse to enforce contracts that are unconscionable or violate public policy). Unconscionability has been described as "overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." *Howard v. Diolosa*, 574 A.2d 995, 999-1000 (N.J. Super. Ct. App. Div. 1990), *certification denied*, 585 A.2d 409 (N.J. 1990). New Jersey courts examine two factors when the issue of unconscionability arises: the unfairness in the formation of the contract (procedural unconscionability) and excessively disproportionate terms (substantive unconscionability). *Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 921 (N.J. Super. Ct. Ch. Div. 2002). Procedural unconscionability may include a "variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Id.* Substantive unconscionability "suggests the exchange of obligations so one-sided as to shock the court's conscience." *Id.*

The Court finds that the First Amended Complaint does not sufficiently allege that the Release was unconscionable. Despite the Bhatias' contention that the Release is procedurally unconscionable, the First Amended Complaint shows that the Bhatias were represented by counsel during the negotiation and execution of the Release. Moreover, although the complaint alleges that the Bhatias were presented with a "take it or leave it" option of accepting another Indianapolis Life policy or losing all of their contributions, the Bhatias specifically stated in the Release that they were signing the Release "voluntarily, after reading this Agreement carefully, and after receiving advice of counsel, all without being subject to duress of any kind." Release ¶ 6. Further, the Bhatias have failed to allege any ambiguities in the Release or unduly complex contract terms that would suggest "the exchange of obligations so one-sided as to shock the court's conscience." *Sitogum Holdings*, 800

- 19 -

A.2d at 921. Instead, the First Amended Complaint points only to the illustrated assumed interest rate, which the Court has already found was not reasonably relied upon, and the fact they were only given the option of exchanging their policy if they did not want to lose the entire value of their contributions, when the complaint notes that the Bhatias were represented by counsel in agreeing to that exchange.[10] In light of the First Amended Complaints' allegations regarding the Bhatias' representation by counsel and the express terms of the Policy Illustration and Release, the Court finds that Plaintiffs have failed to sufficiently allege that the Release should be unenforceable due to unconscionability.

iii.    Void as Against Public Policy?

The Bhatias also argue that the Release is invalid because it is void as against public policy, as "it would be against public policy to allow waivers to shield defendants such as [Indianapolis] Life when it has engaged in intentional misconduct." Pls.' Opp'n Indianapolis Life Mot. 28 (citing *Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. N.J., Inc.*, 497 A.2d 530, 532 (N.J. Super. Ct. App. Div. 1985) for the proposition that exculpatory clauses "are valid where they do not adversely affect the public interest, where the exculpated party is not under a public duty to perform . . . and where the contract does not grow out of unequal bargaining power or is otherwise unconscionable"). However, this authority is unavailing. The Release is not an exculpatory clause which limits liability or relieves Indianapolis Life of liability for all damages in connection with the formation or *future* performance of the *Agreement and Release* itself, but rather primarily an agreement under which the Bhatias agreed

---

[10]Further, the Release states Indianapolis Life's contention that it was not required to provide the policy exchange but would do so in exchange for the Bhatias' execution of the Release and to resolve the Bhatias' dispute with Indianapolis Life. Release 1.

to give up any possible claims in connection with the purchase and performance of its *existing* insurance policy in order to convert that policy into another Indianapolis Life policy.[11] *See Marcinczyk v. N.J. Police Training Comm'n*, 5 A.3d 785, 789 (N.J. 2010) (discussing contracts that seek to exculpate a party from its *future* negligence or wrongdoing); *Hojnowski v. Vans Skate Park*, 901 A.2d 381, 386 (N.J. 2006) ("It is well settled that to contract *in advance* to release tort liability resulting from intentional or reckless conduct violates public policy. . . .") (emphasis added). Indeed, the Bhatias were already aware of the IRS audit and had hired counsel, such that they had at least some awareness of potential claims against Indianapolis Life. Further, as discussed above, the Bhatias do not sufficiently allege fraud in connection with the formation and signing of the Release, and New Jersey "has a long-standing public policy in favor of the negotiated settlement of disputes." *Grow Co. v. Chokshi*, 2006 WL 3783522, *5 (N.J. Super. Ch. Dec. 20, 2006) (discussing settlement of litigation). Accordingly, the Court finds that the First Amended Complaint does not sufficiently allege that the Release is void as against public policy.

In light of the Court's findings that the Bhatias have not properly alleged that the Release was procured by fraud, is unconscionable, or void against public policy, the Court finds that the Bhatias and Indianapolis Life signed a valid release which precludes the Bhatias' claims against Indianapolis Life in connection with the establishment of the Value Life Plan and their purchase of the original life insurance policies to fund the Plan. The Court's findings regarding the validity of the Release also preclude the Bhatias' claims in connection with the policy exchange and signing of the

---

[11]To the extent that the Bhatias argue that the Release's terms contained a void exculpatory clause limiting liability in connection with the formation and performance of the Release, such argument is duplicative of their argument that the Release is unconscionable or was procured by fraud.

Release. As such, Counts One (ERISA), Two (fraud and concealment), Three (breach of fiduciary duty), Four (rescission), and Seven (fraudulent inducement) are hereby **DISMISSED** as to Indianapolis Life.[12]

C.  *Claims Against ECI*

    i.      <u>Fraud Claim</u>[13]

ECI argues that the fraud claim fails against it for failure to plead fraud with particularity. Specifically, ECI states that the complaint does not allege that ECI made any specific representations to the Bhatias nor does it sufficiently allege that ECI intentionally misrepresented or omitted information from the Bhatias or had a duty to disclose any information to them. ECI also faults the First Amended Complaint because its allegations refer to Defendants together as a group, rather than specifically informing ECI of the nature of its alleged participation in the fraud.[14]

---

[12]The Court does not reach the other grounds for dismissal set forth by Indianapolis Life in light of the Court's determination that the Release bars the Bhatias' claims.

[13]The Court incorporates its previous discussion of the elements of fraud under New Jersey law. *See* Section III(B)(i), *supra*.

[14]ECI may also argue that the First Amended Complaint fails to allege why any of its statements were false when made, the complaint does not relate to a pre-existing fact, and any representations by ECI were not reasonably relied upon by the Bhatias, based on this Court's rulings in similar cases regarding § 412(i) plans. *See*, *e.g.*, *Berry v. Indianapolis Life Insur. Co.*, 600 F. Supp. 2d 805, 818 (N.D. Tex. 2009) (finding no reasonable reliance on defendants' representations regarding the legality of certain § 412(i) plans). However, the instant case is distinguishable from that and other related cases. On repleading, this Court in the same case found that there was no definitive guidance from the IRS regarding the legality of § 412(i) plans until the IRS's revenue rulings and proposed and final regulations promulgated in 2004 and 2005. *Berry v. Indianapolis Life*, 638 F. Supp. 2d 732, 738 (N.D. Tex. 2009). As such, any representations regarding the legality of the plans prior to that time were non-actionable opinions or predictions regarding future IRS enforcement. In contrast to *Berry*, the Bhatias set up the Value Life Plan and purchased their insurance policies after most of this additional guidance had been issued such that representations regarding the legality of the Value Life Plan were not merely forward-looking opinions or predictions. *See*, *e.g.*, FAC ¶ 44 (discussing 2004 IRS revenue rulings and proposed regulations). Accordingly, the Court declines to dismiss the fraud and concealment claim for failure to plead why ECI's statements were false when made.

The Court agrees that the First Amended Complaint fails to sufficiently plead the Bhatias' fraud and concealment claim against ECI. While the complaint details misrepresentations or omissions attributed to Defendants Matthew Lang, Robert Lang, and Dischino, who are not alleged to be agents of Indianapolis Life or ECI, it makes limited reference to the allegedly fraudulent actions of ECI which may have induced the Bhatias to establish their § 412(i) plan and enter into the insurance contracts to fund the Plan. The complaint asserts that ECI worked with the Langs to establish the Value Life Plan, the Langs conspired with Pension Strategies and ECI to modify the required annual contributions for the Plan, and ECI designed and distributed the Pendulum Plan. *Id.* at ¶¶ 4, 54, 56. Yet none of these vague allegations specify ECI's specific representations to the Bhatias upon which they relied nor the details of these representations such as when they occurred. The complaint does allege conversations between Moti Bhatia and Lorac and ECI in July 2006 "regarding the impact this IRS investigation might have on the Bhatia's [sic] personal finances," during which "Lorac and ECI reiterated that the plans were perfectly legal and the audit was routine." *Id.* at ¶¶ 68-69. However, the First Amended Complaint's fraud and concealment claim is predicated on the allegedly fraudulent acts that induced the Bhatias to establish their § 412(i) plan and enter into insurance contracts to fund the Plan, not any acts that may have induced them to continue with the plan and contracts after their establishment, such that these conversations in July 2006 are not a proper basis for their fraud claim against ECI. Accordingly, the Bhatias' allegations fail to meet Rule 9(b)'s particularity standard.

Elsewhere, in asserting their fraud claim, the Bhatias make a number of allegations as to the "Defendants" as a group. *See, e.g., id.* at ¶¶ 115-123. Multiple defendants' conduct may be "lumped together" if the plaintiff's allegations elsewhere designate the nature of the defendants' relationship

to a particular scheme and identify the defendants' role. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 274 (N.D. Tex. 1990). However, Rule 9(b) still requires a plaintiff to assert the time, place, and nature of the alleged fraudulent behavior and a defendant's relationship thereto. *Id.* at 273. As such the Court finds that while the Bhatias' lumping of the Defendants' conduct together is not lethal to their claim, their failure to allege ECI's conduct elsewhere with the requisite specificity does render the fraud claim insufficient. As such, the Court finds that ECI's Motion for Judgment on the Pleadings should be and hereby is **GRANTED** to the extent it seeks to dismiss the Bhatias' fraud and concealment claim under Rule 9(b). The Bhatias' fraud and concealment claim is hereby **DISMISSED** against ECI.[15]

    ii.    ERISA Claim

The Bhatias argue that ECI's Motion for Judgment on the Pleadings is premature with respect to the ERISA claim given that the issue of ERISA fiduciary status is a mixed question of fact and law and has been held by some courts as inappropriate for disposition on a motion to dismiss. Pls.' Opp'n ECI Mot. 10 (citing, *inter alia*, *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir. 1995), and *In re Elec. Data Systems Corp. "ERISA" Litigation*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004)). In response, ECI argues that "[w]hile disputed facts may render a Rule 12 motion to dismiss premature, '[i]f factual allegations in a complaint do not sufficiently support a claim that a defendant was a fiduciary, then the claim may be dismissed on a Rule 12(b)(6) motion.'" ECI Mot. Reply 5 (quoting *Goldberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 625 (D.N.J. 2010)). The Court agrees with ECI. The Court's analysis on ECI's Motion regards whether or not the First Amended Complaint has sufficiently pleaded an

---

[15]The Court expresses no opinion as to whether the First Amended Complaint sufficiently pleads a fraud claim or any other claim against Harold Dischino, Dischino & Associates, Matthew Lang, or Lorac.

ERISA violation, including whether the Bhatias have sufficiently pleaded that ECI was an ERISA fiduciary, rather than whether disputed facts tend to show ECI's status as a fiduciary or lack thereof.[16] Accordingly, the Court finds that ECI's Motion is not premature with respect to the ERISA claim.

ECI argues that the ERISA claim is deficient because the First Amended Complaint does not allege that ECI was named as a fiduciary in the instruments establishing the Plan,[17] the complaint does not allege that ECI was made a fiduciary pursuant to a procedure specified in the Plan, and the facts alleged do not establish that ECI falls within the statutory definition of an ERISA fiduciary.[18] In response, the Bhatias argue that ECI falls within the statutory definition of an ERISA fiduciary as "ECI had discretionary authority and control over the management and administration of the Plan." Pls.' Opp'n ECI Mot. 6-9.

ERISA's governing statute provides that:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any

---

[16]The Court previously examined whether the First Amended Complaint sufficiently pleaded that Defendant Pension Strategies was an ERISA fiduciary despite similar arguments by the Bhatias that the issue was premature for resolution on a motion to dismiss. Mem. Op. Mar. 30, 2010 at 8-11.

[17]Nor does an examination of the Plan document reveal that ECI was named as a fiduciary.

[18]ECI argues that it merely "markets qualified plans that include life insurance" and "does not prepare the actual plan documents and administration," but it does serve "as the coordinator and collector of information that is provided to the pension-plan's third-party administrator, Pension Strategies." ECI Mot. Br. 14. ECI contends that it did not exercise any discretionary authority or control with respect to the management of the Plan or the management or disposition of Plan assets, nor did it have discretionary responsibility in the administration of the Plan. Instead, in its view, ECI held a merely ministerial function, rather than fiduciary. Id.

authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan . . . .

29 U.S.C. § 1002(21)(A).

Because ERISA is federal law, the law of this Circuit shall apply. *See Menowitz*, 991 F.2d at 40 (citing *In re Korean Air Lines Disaster*, 829 F.2d at 1175-76) (other citations omitted). The Fifth Circuit has recognized Congress's intent for the definition of "fiduciary" under ERISA to be broadly construed. *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984). Thus, "[a]n ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its assets, and anyone having discretionary authority or responsibility in the plan's administration." *Reich*, 55 F.3d at 1046 (quoting *Pacificare, Inc. v. Martin*, 34 F.3d 834, 837 (9th Cir. 1994)); *see also Donovan*, 747 F.2d at 308 ("'[F]iduciary' should be defined not only by reference to particular titles, such as 'trustee,' but also by considering the authority which a particular person has or exercises over an employee benefit plan."). Yet having an influential role in plan decisions does not necessarily render one a fiduciary. *Reich*, 55 F.3d at 1048 (citing *Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir. 1993)). Rather, whether one's influence essentially confers effective discretionary authority is the benchmark by which such determinations should be made. *Id.* (citing *Maniace v. Commerce Bank*, 40 F.3d 264, 267 (8th Cir. 1994); *Smith v. Nat'l Credit Union Admin. Bd.*, 36 F.3d 1077, 1082 (11th Cir. 1994)).

The First Amended Complaint alleges:

ECI is a fiduciary under 29 U.S.C. §1002(21)(A)(ii) by virtue of its actions to establish the framework of the Value Life Plan. In this capacity, ECI created the Value Life Plan and established the connections with [Indianapolis Life] under which it operated. By directing the opening of the Plan and telling the Bhatias how much to contribute to the plan based on Pension Strategies' calculations, ECI ordered how

the funds would be disposed over the course of the Plan, demonstrating their authority relating to the management of the Plan.

FAC ¶ 108.

The Court first focuses on the Bhatias' specific allegation that ECI qualifies as a fiduciary under 29 U.S.C. § 1002(21)(A)(ii) because it rendered investment advice for a fee. *See id.* The Department of Labor has provided further guidance as to what qualifies as rendering "investment advice" specifically with regard to § 1002(21)(A)(ii) :

> (1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1947 (the Act) and this paragraph, only if:
> > (I) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and
> > (ii) Such person either directly or indirectly (e.g., through or together with any affiliate) –
> > > (A) Has discretionary authority or control, whether or not pursuant to an agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
> > > (B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c). These regulations establish two criteria used to determine whether one is rendering investment advice. First, one must render advice to the plan. Second, one must either have discretionary control with respect to the plan or render advice on a regular basis as part of an arrangement where such advice will serve as the primary basis of investment decisions. *Id.* Previously

this Court found that the complaint alleged Pension Strategies advised the Bhatias on making appropriate contributions to the Value Life Plan each year, and therefore the Bhatias sufficiently alleged that Pension Strategies rendered advice to the Plan. Mem. Op. Mar. 30, 2010 at 11 (citing FAC ¶¶ 80, 90). Similarly, the Court finds that the First Amended Complaint sufficiently alleges that ECI rendered advice to the Plan as it alleged that ECI told the Bhatias how much to contribute and ordered how the funds would be disposed. *See* FAC ¶ 108.

However, the First Amended Complaint does not adequately plead that ECI had discretionary control with respect to the Plan or regularly rendered advice where such advice would serve as the *primary basis* of investment decisions. Plaintiffs have not pleaded sufficient facts to show ECI possessed discretionary control with respect to the Value Life Plan. *See Schloegel*, 994 F.2d at 271 ("Mere influence over the trustee's investment decisions . . . is not effective control over plan assets."); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 (7th Cir. 1991) (noting discretionary authority refers to actual decision-making power, not the influence a professional may have over plan decisions). Nor have the Bhatias pleaded sufficient facts to show ECI rendered advice on a regular basis as part of a mutual agreement that such advice serve as the primary basis of investment decisions. *See Schloegel*, 994 F.2d at 272. Accordingly, the Court finds the Bhatias have failed to plead adequate facts giving rise to a plausible claim against ECI as a fiduciary under ERISA.[19] Thus, to the extent ECI moves the Court to dismiss Plaintiffs' ERISA violation claim under Rule 12(c), the

---

[19]Although the First Amended Complaint's ERISA count only alleges that ECI was a fiduciary pursuant to 29 U.S.C. §1002(21)(A)(ii), the Court also finds that the complaint does not properly allege that ECI was a fiduciary under 29 U.S.C. §1002(21)(A)(i) and 29 U.S.C. §1002(21)(A)(iii), as it does not plead sufficient facts to find that ECI exercised discretionary authority or control respecting management of the Plan or its assets nor authority or control in the administration of the Plan.

Motion should be and hereby is **GRANTED**. The Bhatias' ERISA claim is hereby **DISMISSED** against ECI.

    iii.      <u>Common Law Breach of Fiduciary Duty Claim</u>[20]

Under New Jersey law, "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. *McKelvey v. Pierce*, 800 A.2d 840, 859 (N.J. 2000) (quoting *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997)). Thus, "[a] fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on maters within the scope of their relationship." *Id.*

ECI argues the Bhatias' common law breach of fiduciary duty claim must fail because no facts are alleged from which the Court could infer a fiduciary relationship existed between ECI and the Plaintiffs. Specifically, ECI argues that the Bhatias "allege no special trust and confidence in ECI, and they recite no long series of meetings and communications with ECI such as they had with the other Defendants, which may arguably give rise to such a relationship."[21] ECI Mot. Br. 20. In response, the Bhatias contend that they had an express relationship of trust with ECI and also that ECI's relationship with the Bhatias was "intrinsically fiduciary," given that ECI was the creator of

---

[20]The First Amended Complaint alleges "Plaintiffs have been damaged by the . . . breach by Defendants of their fiduciary duties to the Bhatias to be truthful, honest and not conceal any material fact which could impact upon their decisions to purchase the subject insurance policies." FAC ¶ 125.

[21]This contention appears to have been copied from Pension Strategies' brief in support of its motion to dismiss. *See* Pension Strategies Br. Supp. Mot. Dismiss 21. While the Court found the allegations regarding Pension Strategies insufficient to support a claim for breach of fiduciary duty, Mem. Op. Mar. 30, 2010 at 15, the allegations regarding ECI are considerably more extensive. Further, the ERISA claim and the common law breach of fiduciary duty claims have different elements, such that the First Amended Complaint's failure to allege that ECI had discretionary authority or control over the management or administration of the Plan or Plan assets, *see* Section III(C)(ii), *supra*, is not fatal to the common law breach of fiduciary duty claim.

the Plan, was charged with submitting the Plan to the IRS, marketed the Plan and the insurance, and was the "central party and coordinator for all transactions." Pls.' Opp'n ECI Mot. 12-14.

The Court disagrees with ECI's contention that there are few allegations showing that the Bhatias placed trust and confidence in ECI and few allegations of communications with ECI that would give rise to such a relationship. In addition to its allegation in support of the breach of fiduciary duty count stating that the Bhatias placed trust in all Defendants, the complaint alleges that, in connection with ECI's submission of papers to the IRS in 2005, the Bhatias "continued in their belief that Dischino, Lang, and ECI had been upfront and honest with them." FAC ¶¶ 64-65, 125. The complaint also alleges that Motilal Bhatia talked several times in July 2006 with representatives at Lorac, ECI, and Dischino regarding the impact of the IRS investigation on the Bhatias' finances, during which "Lorac and ECI reiterated that the plans were perfectly legal and the audit was routine." FAC ¶¶ 68-69. Finally, the complaint discusses a November 15, 2006 conference call between the Bhatias, Robert Lang, and ECI to determine the best means of terminating the Value Life Plan, and Dischino, Lang, and ECI, through Matt Lang, "advised the Bhatias to continue with [the] Plan." FAC ¶¶ 74-75. While several of these allegations concern the Bhatias' trust and confidence in ECI after their establishment of their § 412(i) plan, viewing the entire complaint in a light most favorable to the Plaintiffs, the Court finds that the complaint pleads sufficient facts to support the Bhatias' claim for breach of fiduciary duty against ECI.[22] Accordingly, the Court **DENIES** ECI's Motion for Judgment on the Pleadings to the extent it seeks dismissal of the breach of fiduciary duty claim against ECI.

---

[22]ECI does not argue that Rule 9(b) applies to the breach of fiduciary duty claim, and the Court declines to subject this claim to Rule 9(b)'s more stringent pleading standard.

iv.   Rescission Claim

Rescission is an equitable remedy intended "to restore the parties to the *status quo ante* and prevent the party who is responsible for [a] misrepresentation from gaining a benefit." *Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 662 (N.J. 1989). The Bhatias allege that "[i]n order to restore the Bhatias to their rightful position, it is necessary to rescind the subject insurance policies, *ab initio*." FAC. ¶ 128. However, the Bhatias do not allege that ECI is a party to the insurance contracts in question. Accordingly, the Court finds Plaintiffs have failed to allege a claim upon which relief can be granted with respect to the rescission claim against ECI. Further, the Bhatias' brief in opposition to ECI's Motion expressly states that "Plaintiffs concur in Judgment on the Pleadings solely with respect to Plaintiffs' rescission claim." Pls.' Opp'n ECI Mot. 2 n.1. Thus, to the extent ECI's Motion for Judgment on the Pleadings seeks to dismiss Plaintiffs' rescission claim under Rule 12(c), the Motion should be and hereby is **GRANTED**. The rescission count is hereby **DISMISSED** with respect to ECI.

v.   Professional Negligence/Malpractice Claim

The New Jersey Supreme Court has explained "[o]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities," and deviation from the accepted standards of care governing that profession will result in liability for negligence.

*Levine v. Wiss & Co.*, 478 A.2d 397, 399 (N.J. 1984) (citing Restatement (Second) of Torts § 299A (1965)).[23]

In support of its Motion, ECI repeats its contention that it was only a marketer of insurance and qualified plans, with no discretionary authority or control over the management or administration of the Plan or Plan assets. ECI also cites and attaches a "Pendulum Plan Disclosure and Acknowledgment" signed by "Radha Bhatia" on June 25, 2005, which stated that the signer would not rely on any information it may have received from ECI "with respect to the tax treatment or consequences of participation in the plan," and which stated that the signer "has determined to participate in the plan only after seeking the advice of independent counsel concerning the tax consequences of the Employer's participation in the plan and that the Employer has not relied upon either ECI or its employees or agents with respect to any tax advice concerning the plan." ECI Mot. Br. 23 (quoting ECI Mot. Ex. B). In response, the Bhatias argue that ECI was required to exercise its professional skill and knowledge when it created and designed the Pendulum Plan, set up the Plan, coordinated activities between the Bhatias and other Defendants, submitted information to the IRS on the Bhatias' behalf, and counseled the Bhatias about the ongoing viability of the Plan. Pls.' Opp'n ECI Mot. at 18 (citing FAC ¶¶ 54, 69, 74-75). The Bhatias also argue that not only did they seek what they thought was independent advice from Dischino and Robert and Matthew Lang,

---

[23]ECI also argues that the Bhatias were required to provide an affidavit of merit in support of their professional negligence claim. However, as pointed out by the Bhatias, this requirement only applies to actions seeking damages for personal injuries, wrongful death, or property damage. Pls.' Opp'n ECI Mot. 21-22 (citing N.J.S.A. 2A:53A-27); *see also Couri v. Gardner*, 801 A.2d 1134, 1136-38 (N.J. 2002) (discussing N.J. affidavit of merit statute). ECI provides no argument to rebut this contention. Without deciding whether this requirement is a pleading standard which is applicable in the Fifth Circuit, the Court finds that the Bhatias do not claim damages for personal injuries, wrongful death, or property damage, and therefore they are not required to provide an affidavit of merit.

"the ECI Defendants cannot disclaim the responsibility to perform required duties pursuant to certain standards by directing Plaintiffs to consult with another party." *Id.* at 20.

The First Amended Complaint's Professional Negligence/Malpractice claim alleges "Defendants Dischino, Dischino and Associates, Hartstein, ECI, the Langs, and Lorac Financial Services, Inc. . . had a duty to the Bhatias and the Value Life Plan to provide proper and competent accounting, tax advice, and financial planning services." FAC ¶ 131. The complaint continues with allegations discussing the failure of Defendants Dischino, Matthew Lang, and Robert Lang to fulfill this duty.

Accepting the First Amended Complaint's well-pleaded allegations as true, the Court finds that the complaint has adequately stated a claim for professional negligence/malpractice against ECI. While ECI contends the Disclosure shows that the Bhatias could not have relied on information regarding the tax consequences of their participation in the Plan and bars the professional negligence claim, such an argument tends towards the merits of the Bhatias' claims and is more appropriately reserved for a dispositive motion.[24] Having thus found the pleadings sufficient, ECI's Motion for Judgment on the Pleadings is **DENIED** to the extent it seeks to dismiss Bhatia's professional negligence/malpractice claim under Rule 12(c).

vi.    Negligence Claim

Under New Jersey law, a negligence claim must allege that defendant breached a duty of reasonable care, which constituted a proximate cause of the plaintiff's injuries. *Brown v. Racquet Club*

---

[24]Without opining on what ECI's professional duties may be, if any, the Court agrees with the Bhatias' contention that ECI may not relieve itself of the duty to act in accordance with the applicable standards for care through the use of a disclaimer.

*of Bricktown*, 471 A.2d 25, 29 (N.J. 1984) (citing *Hansen v. Eagle-Picher Lead Co.*, 84 A.2d 281, 284 (N.J. 1951)). Bhatia's First Amended Complaint alleges that ECI "owed the Bhatias and the Value Life Plan a duty of care to exercise reasonable care under the circumstances to devise, develop, market, and sell a [§] 412(i) plan that was reasonably suited to the needs of Plaintiffs." FAC ¶ 143. The complaint also alleges that ECI owed a duty of care to "ensure that ECI's Pendulum Plan would provide the Bhatias and the Value Life Plan with benefits promised to them by ECI and any persons or entities acting on ECI's behalf." *Id.* at ¶ 144. ECI breached these duties, according to the complaint, by "failing to design a [§] 412(i) plan suitable to Plaintiffs' needs and wishes and by further failing to take adequate precautions to ensure that Plaintiffs would not be subjected to any adverse action by the IRS in connection with Plaintiffs' Value Life Plan." *Id.* at ¶ 145.

In its Motion, ECI contends that the allegations the Bhatias make in support of their negligence claim are contradicted by the Value Life Plan documents and, as such, the Court need not accept such allegations as true. ECI Mot. Br. 24 (citations omitted). ECI further argues that it is merely a marketer of qualified plans, does not prepare the actual plan documents, and did not exercise any discretionary authority or control with respect to the Plan, apparently in support of its contention that it owes no duty to Bhatia. *Id.* at 25. In response, the Bhatias argue that ECI has not shown why the Plan documents contradict the allegations in the First Amended Complaint that ECI designed, sold, and helped maintain the Value Life Plan but failed to inform them of the illegality of the structure of the Plan. Pls.' Opp'n ECI Mot. 22-24. In their view, "[n]owhere in the Plan documents are ECI's duties laid out, nor is their liability for negligence limited," and therefore the complaint states a claim for ECI's negligence. *Id.* at 24.

Accepting the First Amended Complaint's well-pleaded allegations as true, the Court finds that the complaint has adequately stated a claim for negligence against ECI. While ECI contends such allegations conflict with its interpretation of the Value Life Plan documents, such an argument tends towards the merits of the Bhatias' claims and is more appropriately reserved for a dispositive motion. Having thus found the pleadings sufficient, ECI's Motion for Judgment on the Pleadings is **DENIED** to the extent it seeks to dismiss the Bhatias' negligence claim under Rule 12(c).

## IV.

### CONCLUSION

The Court **GRANTS** Indianapolis Life's Motion for Judgment on the Pleadings to the extent it seeks dismissal of the Bhatias' claims against it based on the parties' Release. The Bhatias' claims against Indianapolis Life are hereby **DISMISSED WITH PREJUDICE** under Rule 9(b) and Rule 12(b)(6) in light of the Court's findings regarding the Release. The Court **GRANTS IN PART** and **DENIES IN PART** ECI's Motion for Judgment on the Pleadings. The Court **GRANTS** ECI's Motion to the extent it seeks dismissal of the Bhatias' ERISA and rescission claims under Rule 12(c) and dismissal of the Bhatias' fraud and concealment claim under Rule 9(b). The Bhatias' claims against ECI and Kenneth Hartstein for ERISA and fraud and concealment are hereby **DISMISSED WITHOUT PREJUDICE**. The Bhatias' claim against ECI and Kenneth Hartstein for rescission is hereby **DISMISSED WITH PREJUDICE**. ECI's Motion is **DENIED** to the extent it seeks dismissal of Bhatia's breach of fiduciary duty, professional negligence/malpractice, and negligence claims against ECI and Kenneth Hartstein under Rule 12(c).

Dismissal of a claim short of a merits review is not taken lightly by the Court. Thus, a plaintiff should be given the opportunity to amend a Complaint where it appears that more careful or detailed

drafting might overcome the deficiencies on which dismissal is based. *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n. 6 (5th Cir. 2000) (noting that a court may dismiss a claim for failing to comply with Rule 9(b), but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead particularity after being afforded repeated opportunities to do so"); *Hitt v. City of Pasadena*, 561 F.2d 606, 608-09 (5th Cir. 1977) (observing that a complaint should only be dismissed under Rule 12(b)(6) "after affording every opportunity for the plaintiff to state a claim upon which relief can be granted"). Moreover, the Bhatias have specifically requested the opportunity to replead.

Accordingly, if Plaintiffs are able to replead any Counts to overcome all of the grounds stated herein for dismissal as to ECI and Hartstein, they should do so by no later than twenty (20) days from the date of this Order.[25] Further, any repleading shall be accompanied by a synopsis of no more than five (5) pages, explaining how the amendments overcome the grounds stated herein for dismissal. Should Plaintiffs replead, ECI and Hartstein are hereby granted leave to file a response to Plaintiffs' synopsis. Any such responses shall not exceed five (5) pages and must be filed within ten calendar days of the repleading. No further briefing will be permitted.


**SO ORDERED.**

**DATED: August 29, 2011.**

---

[25]In its March 30, 2010 order dismissing certain claims against Pension Strategies, the Court gave the Bhatias leave to file an amended complaint against Pension Strategies within twenty days of that order. The Bhatias did not file an amended complaint before that deadline expired. Accordingly, any amended complaint filed pursuant to the Court's instructions in this opinion may not reassert the claims previously dismissed as to Pension Strategies in the March 30, 2010 order.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE